Allen **HALLDORSON** and Robert Lepage, Plaintiffs, Appellants and Cross-Appellees,

v.

Lloyd **GUNDERSON**, Lloyd's Ltd., a corporation, and Western Underwriters, Inc., a corporation, and Lloyd Gunderson d/b/a Lloyd's Limited and Western Underwriters, Inc., jointly and severally, Defendants, Appellees and Cross-Appellants.

Civ. No. 10735.

Supreme Court of North Dakota.

March 2, 1987.

---

Alan J. Sheppard, Fargo, for plaintiff, appellant and cross-appellee Allen Halldorson.

Solberg, Stewart, Boulger, & Miller, Fargo, for plaintiff, appellant and cross-appellee Robert Lepage; argued by Erik R. Johnson.

Serkland, Lundberg, Erickson, Marcil & McLean, Fargo, for defendants, appellees, and cross-appellants; argued by Maureen Holman.

MESCHKE, Justice.

Allen Halldorson appeals from that part of a judgment awarding $16,015.37 to Lloyd Gunderson and his two insurance agencies for excess salaries paid to Halldorson and Lepage. Gunderson cross appeals from that part of the judgment awarding $22,000 to Halldorson and Lepage for $10,000 earnest money paid by them to Gunderson in an unsuccessful effort to purchase his insurance agencies, and for a $12,000 capital contribution by them to the insurance businesses.[1] We modify and affirm.

Halldorson began work for Gunderson's insurance agencies, Lloyd's, Ltd. and Western Underwriters, in November, 1982. Halldorson was negotiating to purchase the agencies and understood that the arrangement "would either work into employment or a purchase or would be dissolved at some point down the road."

In December, 1982, Robert Lepage began work for the agencies as an accountant. Thereafter, Halldorson and Lepage together negotiated with Gunderson about purchasing the insurance businesses. On July 1, 1983, they paid Gunderson $10,000 earnest money and he signed a letter stating:

"This letter is to confirm our verbal agreement as to the sale of Lloyds Ltd. and Western Underwriters. The sale price on an as-is basis is $50,000.00.

"Upon receipt of $10,000.00 earnest money deposit, we will initiate the sale contract as discussed and agreed.

"We look forward to an early closing in this matter."

Gunderson then went on a drinking binge and was absent from the businesses for most of July. Without further written agreement, Halldorson and Lepage took charge of and operated the insurance agencies. They borrowed $30,000 on behalf of Western Underwriters, but Halldorson

---

1. Robert Lepage has not appealed, but appears only to defend against Gunderson's cross-appeal.

withdrew $18,000 of it to pay personal debts. In late July, Gunderson returned, discovered changes, and repudiated the sale.

Halldorson and Lepage continued to operate the agencies. In October, 1983, they sued Gunderson for specific performance or for return of their money as well as for payment of some salaries claimed to be unpaid. Gunderson sought damages, counterclaiming that Halldorson and Lepage had wrongfully operated the agencies.

The trial court denied specific performance because the agreement "lacked the essential terms and conditions and is not sufficiently definite ..." and ordered the agencies returned to Gunderson.

The trial court determined that Halldorson and Lepage were each entitled to $1,500 for each month they worked after July 1, 1983, adding up to $12,750 each, for a total of $25,500. The trial court calculated that they had received $41,515.37, and held that they must repay $16,015.37 "for excess salaries." While the trial court found that Halldorson was also entitled to $1,500 per month for his work before July 1, it concluded there was insufficient evidence "to make a computation as to salaries owed to ... Halldorson, prior to July 1, 1983." The trial court also ordered Halldorson and Lepage to repay $4,030 for other items.

The trial court held that Halldorson and Lepage exceeded their authority in borrowing $30,000 for Western Underwriters and therefore concluded that Gunderson and his agencies were not liable for that debt. Gunderson and his agencies were ordered to repay Halldorson and Lepage $22,000 for the $10,000 earnest money and for the $12,000 capital contribution left in Western Underwriters from the borrowed money.

## I. Compensation to Halldorson
### A. Before July 1, 1983

■ The trial court found:

"33. That the Plaintiff, Allen Halldorson, went to work for Defendants in 1982, and at some [point] in time in 1983, agreed with Defendant, Gunderson, to work for $1,500.00 per month."

The trial court concluded:

"11. That the Plaintiff, Halldorson, is entitled to compensation at a rate of $1,500.00 per month prior to July 1, 1983.

" . . . .

"13. That the Court has insufficient evidence before it to make a computation as to salaries owed to Plaintiff, Halldorson, prior to July 1, 1983."

The parties interpret these conclusions differently. Gunderson argues the court's finding that "Halldorson ... at some [point] in time in 1983, agreed with Defendant, Gunderson, to work for $1,500.00 per month," recognized that Halldorson was to be paid only as the company could afford it. Since Halldorson did not show that the agencies could have afforded to pay that salary prior to July 1, Gunderson urges that this explains why the trial court concluded there was insufficient evidence. But Halldorson argues that the trial court was apparently uncertain about when salary was to commence and directs our attention to evidence indicating it was to begin in December, 1982.

However, some evidence also indicates that Halldorson was to begin receiving monthly salary at some later time. Halldorson testified that, when he came to work, he agreed to little or no pay until the businesses were "out of the woods financially." And, he acknowledged that the businesses were short on cash through June, 1983.

Thus, even if we follow Halldorson's interpretation, we are not convinced that the trial court was mistaken in finding the evidence insufficient to compute additional salary for Halldorson before July 1.

### B. After July 1, 1983

■ The trial court found that the reasonable value of Halldorson's and Lepage's services after July 1 was $12,750 each, but that Halldorson was paid $27,450.23 and Lepage was paid $14,064.14. Therefore, the trial court ordered them to repay $16,-

015.37 for excess salaries drawn after July 1.

Halldorson argues that the trial court erroneously included an amount of $6,200 that he was paid before July 1, in the computation of the amount of $27,450.23 paid to him after July 1. Therefore, he argues that he and Lepage owe $9,800, not $16,000, for excess salaries drawn after July 1.

Gunderson concedes that the trial court so erred in computing salaries paid after July 1, but contends that the trial court also overlooked other offsetting computations, such as health insurance premiums paid for Halldorson and Lepage, and urges us to correct the court's calculations correspondingly.

We are not convinced that the trial court made a mistake in not calculating every possible adjustment between the agencies and Halldorson and Lepage. The trial court determined that the financial condition of the agencies "cannot be said to have substantially changed ... after July 1, 1983, from its condition prior to July 1, 1983," and that Gunderson's conduct "facilitated and necessitated subsequent conduct and acts" by Halldorson and Lepage after July 1. The items urged by Gunderson as offsetting are neither conceded nor evident, but the error in calculating salary paid Halldorson after July 1 is plain. Therefore, we modify that part of the judgment awarding $16,015.37 to Gunderson for excess salaries, reducing it to $9,815.37.

## II. Restitution by Gunderson.

The trial court decreed return of the agencies to Gunderson and ordered him to pay back the $10,000 earnest money. The trial court also concluded that Gunderson and his agencies were not liable for the $30,000 debt incurred by Halldorson, but they had to pay back the $12,000 in net loan proceeds left in the insurance businesses. Gunderson argues that the order for repayment of these amounts was based on an unsupported theory of unjust enrichment.

"Earnest money is generally defined as a comparatively small down payment made as an assurance that the purchaser is in earnest and good faith and that *if he fails to purchase the property the deposit will be forfeited.* [Citations omitted]. In effect, earnest money operates as liquidated damages. [Citations omitted]." *Bishop Ryan High School v. Lindberg,* 370 N.W.2d 726, 728 (N.D. 1985) (Emphasis added).

Ordinarily, a seller may retain earnest money when the buyer breaches the sales agreement, not when the seller refuses to sell. Since Gunderson was unwilling to complete the sale, he cannot keep the deposit. We therefore affirm the order that Gunderson return the earnest money.

Gunderson cites *D.C. Trautman Co. v. Fargo Excavating Co.,* 380 N.W.2d 644 (N.D.1986), which lists elements for recovery on a theory of unjust enrichment. He argues that there would not be an "[a]bsence of a justification for the enrichment and the impoverishment" which would result if he kept the $12,000 capital contribution. He contends that Halldorson and Lepage have recovered more than that by drawing excess salaries while they were in control. But, Gunderson's argument fails to take into account that Halldorson and Lepage have been ordered to return all salaries which they did not earn.

Gunderson contends that he should keep the $22,000 for "damages" to the business reputations of the agencies, as well as to Gunderson for "the emotional trauma of losing total control of his own business." But, these arguments conflict with determinations by the trial court that the financial condition of the agencies did not substantially change while Halldorson and Lepage were operating them, that they did not act maliciously, that Gunderson's conduct "facilitated and necessitated" their actions, and that Gunderson "failed to sustain his burden of proof upon the issue of mental anguish." Accordingly, we affirm that portion of the judgment ordering Gunderson to pay $22,000 back to Halldorson and Lepage.

In summary, we modify that part of the judgment awarding $16,015.37 to Gunderson for excess salaries, reducing it to $9,815.37 as directed herein, and otherwise affirm.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.